**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Sheldon L. Pollock
Adam Grace
Travis Hill
Nicholas Flath
Rhonda L. Jung
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9135 (Hill)
HillTr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                  Plaintiff,<br><br>              -against-<br><br>**AKSHAY KAMBOJ and DEV KAMBOJ,**<br><br>                                  Defendants. | **COMPLAINT**<br><br>**24 Civ. 7319**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Akshay Kamboj and Dev Kamboj (together, "Defendants") alleges as follows:

**SUMMARY**

1.      Beginning in April 2022, Defendants used fake trading data and forged audit reports to convince dozens of investors to invest approximately $16 million in a currency trading hedge fund (the "Fund") managed by their firm, Crawford Ventures IM, LLC (the "Investment Firm").

2. Defendants falsely represented to prospective investors in the Fund that they were successful traders who had generated average annualized returns of nearly 70% on behalf of investors in certain separately managed accounts, using the same investment strategy as the Fund's. But in fact, these returns were fabricated.

3. Based on these fabricated returns, Defendants touted in marketing materials for investors that the Fund ranked as the "World's #1 Performing Fund" out of thousands of hedge funds.

4. Additionally, Defendants used forged audit reports—ostensibly issued by a global accounting firm (the "Audit Firm")—to verify their trading record, and even created an email account with a domain name resembling that of the Audit Firm to perpetuate and conceal their fraud.

5. By December 2023, in the face of substantial trading losses, the Investment Firm announced plans to voluntarily liquidate the Fund.

6. As a result of Defendants' fraud, investors suffered aggregate net losses of approximately $4.1 million.

7. Meanwhile, Defendants personally profited through hundreds of thousands of dollars in management and performance fees.

## VIOLATIONS

8. By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and

courses of business alleged in this Complaint occurred within this District. For example, at all relevant times, the Investment Firm was headquartered in Manhattan. Additionally, Defendants sent fabricated trading data and forged reports to Evan H. Katz ("Katz"), an Investment Firm partner who worked out of Manhattan. Defendants also caused the Investment Firm to send false marketing materials to at least one prospective investor located in Manhattan.

## DEFENDANTS

15. **Akshay Kamboj**, age 33, resides in Gurguram, India. At all relevant times following formation of the Fund, he was the Fund's Co-Chief Investment Officer (with his brother Dev Kamboj) and Head of Strategy Development. He also owns 25% of the Investment Firm and the Fund's general partner, Crawford Ventures GP ("General Partner"), and was a manager of both entities.

16. **Dev Kamboj**, age 39, resides in Gurguram, India. At all relevant times following formation of the Fund, he was the Fund's Co-Chief Investment Officer (with his brother Akshay Kamboj) and Head of Research. He also owns 25% of the Investment Firm and the General Partner and was a manager of both entities.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

17. **Katz** resides in Queens, New York. He is the managing director of an alternative asset investment firm that raises capital for hedge funds and private equity funds. At all relevant times following formation of the Fund, he was the Fund's Chief Operating Officer and General Counsel. Katz also owns a 25% interest in the Investment Firm and the General Partner and was a manager of both entities.

18. **The Fund** was a currency trading hedge fund formed as a Delaware limited partnership in December 2021. The Fund was co-founded and managed by Defendants and

Katz. It commenced trading activities in September 2022 and has been dormant since early 2024. In May 2024, Katz commenced a proceeding in Delaware Chancery Court to dissolve the General Partner and the Investment Firm and appoint a liquidating trustee for the Fund. That proceeding is pending as of the date of this Complaint.

19. **The Investment Firm** is a Delaware limited liability company formed in December 2021. The Investment Firm was the Fund's investment manager and was entitled to receive 2% of the Fund's assets under management per year in management fees under the Fund's limited partnership agreement. As of the date of this Complaint, the Investment Firm is the subject of dissolution proceedings pending in Delaware Chancery Court.

20. **General Partner** is a Delaware limited liability company formed in December 2021 and the general partner of the Fund. Pursuant to the Fund's limited partnership agreement, General Partner was entitled to receive 20% of the Fund's net profits as performance fees. As of the date of this Complaint, the General Partner is the subject of dissolution proceedings pending in Delaware Chancery Court.

## FACTS

**I. Background on Defendants' Fabrication of Their Trading Performance**

21. On or about May 11, 2021, prior to the formation of the Investment Firm or the Fund, Akshay Kamboj sent an unsolicited email to Katz, a United States-based hedge fund marketing consultant, to ask for assistance in "raising capital and connecting us to your well established network."

**A. Defendants Fabricated Their Historical Trading Performance**

22. The email attached a performance report claiming that, between 2018 and 2020, Defendants had generated average annual returns on investment of 78.71% by trading currencies

and that, as of 2021, Defendants had aggregate assets under management of more than $30 million (the "Historical Performance Report").

23.    The email also attached a prospectus in which the Defendants asserted that they used four different brokerage firms for "trade execution," including a Swiss broker.

24.    Separately, the email attached a transactions sheet ("Historical Transactions Sheet") purporting to show a trade-by-trade record of net profits on trades since April 2018 in an account for a Kamboj family fund that Defendants managed at the Swiss broker named in the prospectus (the "Brokerage Account"). These transactions appeared to represent a component of the aggregate returns shown in the Historical Performance Report.

25.    The purported net profits shown in the Historical Transactions Sheet ranged from thousands to tens of thousands of dollars per individual trade, and from several hundred thousand dollars to more than one million dollars per quarter, and over the entire reported period, totaled more than $11.8 million.

26.    As reflected by the actual trading records for the Brokerage Account, the Historical Transactions Sheet sent to Katz included fake trades and altered trade data, falsely inflating Defendants' returns.

27.    Specifically, 695 of the 793 total trades shown on the Historical Transactions Sheet, purportedly placed between April 2018 and November 18, 2019, were fake, because the Brokerage Account in which these trades supposedly had been placed was not opened until November 19, 2019. These fake trades accounted for more than $6.9 million of supposed trading profits.

28.    Further, 81 of the remaining 98 trades reported on the Historical Transactions Sheet, supposedly placed on or after November 19, 2019, do not have ticket numbers that match

real trades placed in the Brokerage Account. These 81 additional fake trades account for $3.8 million of supposed trading profits.

29. For the remaining 17 trades on the Historical Transactions Sheet whose ticket numbers match ticket numbers of real trades, the Historical Transactions Sheet falsely altered information about the trades in a way that overstated the supposed profits. These 17 trades, in reality, resulted in aggregate net profits of only $86.73. The Historical Transactions Sheet, by contrast, reported net profits of almost $1 million from these trades.

30. Finally, the Historical Transactions Sheet omitted at least 20 real trades which had occurred in the Brokerage Account between November 19, 2019 and March 31, 2021, and resulted in aggregate net losses of more than $19,000.

31. In total, the actual trading record of the Brokerage Account during the period November 19, 2019 to March 31, 2021 reflected net aggregate losses of almost $20,000–not the net profits of $11.8 million reported on the Historical Transaction Sheets.

32. Accordingly, the millions of dollars of trading profits reported in the Historical Transactions Sheet were fictitious. And because the Historical Performance Report relied on the accuracy of the Historical Transaction Sheets, the Historical Performance Report was fictitious as well.

### B. Defendants Fabricated Two Audit Reports

33. To add legitimacy to Defendants' fake trading history, on or about May 25, 2021, Akshay Kamboj sent Katz a purported independent audit report of the Kamboj family fund's 2020 financial statements issued by the Audit Firm (the "Financial Statements Audit Report").

34. But the Financial Statements Audit Report was forged. As Defendants knew by virtue of their roles managing the Kamboj family fund, the Audit Firm did not perform any work for Defendants or their family fund.

35. In or around June 2021, Katz agreed to co-found the Fund with Defendants, and it was formally established in December 2021.

36. In or around March 2022, in preparation for soliciting investors in the Fund, Katz asked Defendants to have the Audit Firm prepare a report verifying the historical investment returns that Defendants had previously presented to Katz in the Historical Performance Report and Historical Transaction Sheet.

37. In or around April 2022, Defendants provided Katz what purported to be a performance audit report for the Kamboj family fund issued by the Audit Firm (the "Performance Audit Report").

38. The Performance Audit Report, like the Financial Statements Audit Report, was a forgery, which purported to verify the historical investment returns shown in the Historical Performance Report and the Historical Transaction Sheet.

39. The Performance Audit Report also listed a fake email address ("Fake Email Address") for the Audit Firm partner who ostensibly signed both the Financial Statement Audit Report and Performance Audit Report (the "Audit Firm Partner").

40. The Fake Email Address contained a domain name similar to the real Audit Firm's actual domain, but which was purchased in June 2021 by an individual providing a phone number used by Defendants.

41. As Defendants knew or recklessly disregarded, the Audit Firm never issued an audit report of any kind for Defendants or the Kamboj family fund the Defendants managed, and

the investment returns reflected in the Performance Audit Report did not accurately reflect Defendants' trading history.

42. Defendants did not tell Katz that their trading record was fake, nor did they tell him that they had forged the Financial Statements Audit Report or the Performance Audit.

## II. Defendants Prepared False and Misleading Marketing Materials for the Fund Based on Their Fictitious Returns.

43. In late 2021 and early 2022, Defendants, together with Katz, developed a marketing strategy for investor outreach and authored marketing materials for the Fund. These marketing materials included a PowerPoint presentation (the "PowerPoint") and a one-page promotional document (the "One Pager").

44. Defendants approved the content of the PowerPoint and One Pager.

45. The PowerPoint and the One Pager highlighted Defendants' fictitious trading returns as reflected in the Historical Performance Report and ostensibly verified by the Performance Audit Report and the Historical Transaction Sheets, characterizing them as "the actual performance metrics that have been managed" by Defendants in separately managed accounts, using the fund's strategy since February 2016."

46. For example, the PowerPoint falsely asserted that "our fund's strategy has produced, since its inception in February 2016, exceptionally favorable investment performance metrics," and that "six years of proven track record and a repeatable process that has provided high-return high-consistency returns of almost +70% per year (CAGR)[1] with minimal drawdowns."

---

[1] "CAGR" means Compound Annual Growth Rate. CAGR is the mean annual growth rate of an investment over a period longer than one year, with the effect of compounding taken into effect. *See* Investopedia, *Compound Annual Growth Rate (CAGR): What You Should Know*, May 15, 2024, available at https://www.investopedia.com/investing/compound-annual-growth-rate-what-you-should-know/.

9

47. Both the PowerPoint and the One Pager also included a month-by-month chart of supposed trading returns dating back to April 2016, as well as a summary chart showing the Defendants' strategy's "cumulative return" and "annualized return," among other metrics. These supposed trading returns were the same trading returns supposedly verified by the Performance Audit Report and the Historical Transaction Sheets.

48. As Defendants knew, these trading returns and metrics were fictitious. As discussed above, Defendants altered and inflated their actual trading record to radically overstate the success of their trading strategy.

49. The PowerPoint also falsely claimed that the Fund ranked as "the World's #1 Performing Fund for Best 3 and 5 Year Returns of any Equity Hedge Fund, CTA, or Currency Fund."

50. The ranking was based on information provided by a hedge fund analytics service ("Service 1") during a December 2021 videoconference in which Service 1 was promoting its analytics product to the Investment Firm.

51. As Defendants knew or recklessly disregarded, Service 1's comparison of the Fund's performance to other funds in Service 1's database was based on Defendants' fabricated trading data that Katz sent to Service 1 in a November 2021 email, with Defendants' consent.

52. During the December 2021 videoconference, Service 1 displayed charts showing how Defendants' (fabricated) trading record would rank in Service 1's database of fund performance.

53. Dev Kamboj then inserted screenshots of those charts—which he knew did not accurately reflect Defendants' actual trading performance—into the PowerPoint to demonstrate the Fund's purported "#1" ranking.

10

54. The Fund's July 2022 private placement memorandum ("PPM") also cited Service 1's purported "rank[ing] of [Defendants'] investment strategy . . . as the world's #1 performing strategy for best three- and five-year returns" as a fact that "limited" the risk relating to the Fund's lack of operating performance history.

55. This statement in the PPM was false and misleading because, as Defendants knew or recklessly disregarded, Service 1's analysis was based on fabricated trading data.

56. Defendants had primary drafting responsibility for the PPM and approved its contents. Additionally, Akshay Kamboj sent the PPM to third parties, including the Fund's broker.

57. In addition to the falsely procured analysis by Service 1, the PowerPoint for the Fund touted eight awards that the Fund obtained from a second hedge fund analytics service ("Service 2") between February and August 2022, based on the purported (but fictious) returns employed by the Fund's strategy.

58. Service 2 issued the awards based on the fake monthly returns reflected in the Fund's One Pager and PowerPoint, which the Investment Firm sent to Service 2.

59. As Defendants knew or recklessly disregarded, touting the awards from Service 2 was misleading because the awards did not reflect, and were not based upon, Defendants' actual trading performance.

III. **Defendants Used the False PowerPoint, One Pager, PPM, and Performance Audit Report to Solicit Investors.**

60. In or around April 2022, the Investment Firm began communicating with prospective investors about the opportunity to invest in the Fund.

11

61. From in or around April 2022 to in or around August 2023, with Defendants' approval, the Investment Firm sent the PowerPoint, One Pager, and PPM to prospective investors, including at least one prospective investor located in New York, New York.

62. As discussed above, the PowerPoint and the One Pager featured Defendants' fake trading records, as well as accolades attributed to Service 1 and Serve 2, which were based on the fake data.

63. With Defendants' knowledge and approval, the Investment Firm sent certain prospective investors the forged Performance Audit Report, and encouraged them to contact the Audit Firm Partner who appeared to sign the report at the Fake Email Address associated with Defendants.

A. **Solicitation of Adviser-1's Clients**

64. In or around May 2022, Katz emailed the One Pager, the PowerPoint, and the Performance Audit Report to an investment adviser ("Adviser 1") in connection with the Investment Firm's efforts to solicit the investment adviser's clients to invest in the Fund.

65. A few days later, Katz, copying Defendants, sought to introduce Adviser 1 via email to the Audit Firm Partner to facilitate Adviser 1's due diligence on behalf of clients interested in investing in the Fund. Unbeknownst to Katz or Adviser 1, the email address identified for the Audit Firm Partner was actually the Fake Email Address associated with Defendants.

66. Thereafter, Adviser 1 communicated about the Performance Audit Report with the Fake Email Address associated with Defendants. For example, on May 24, 2022, a representative of Adviser 1 asked for confirmation that Audit Firm had generated the Performance Audit. Later that day, a message sent from the Fake Email Address stated in reply, "Yes, we are the official auditing firm for [the Kamboj family fund] from FY 2016-2020."

67. Dev Kamboj himself also personally communicated by phone and email with a representative of Adviser 1. In these communications, he referred Adviser 1 to the (forged) Performance Audit Report.

68. Following Adviser 1's receipt of the false One Pager and PowerPoint and forged Performance Audit Report, and after Adviser 1's communications with the Fake Email Address that Adviser 1 believed belonged to the actual Audit Firm Partner, Adviser 1 recommended that its advisory clients invest in the Fund.

69. Ultimately, clients referred by Adviser 1 and its affiliates invested more than $9 million in the Fund, accounting for more than half of the Fund's total assets under management.

70. Adviser 1 would not have recommended the Fund to its clients had Adviser 1 known that the One Pager, the PowerPoint, and the Performance Audit Report reflected fabricated investment returns and that the Performance Audit Report was forged.

**B. Solicitation of Investor 1**

71. In or around June 2022, Defendants and Katz participated in a videoconference with representatives of another prospective investor ("Investor 1").

72. In or around August 2022, Katz sent the One Pager, PowerPoint, and Performance Audit Report to representatives of Investor 1. Katz wrote that "Akshay and Dev's globally #1 ranked track record is, of course, audited by a large and highly competent accounting and audit firm (e.g., several hundred employees, about 20 offices, some 10,000 clients, etc.). Attached is a copy of their audit and performance confirmation."

73. After receiving the fake trading returns featured in the One Pager, the PowerPoint, and the Performance Audit Report, in or around August 2022, Investor 1 invested $3 million in the Fund, becoming the largest single investor.

13

74. The Performance Audit Report, which was in fact forged, gave Investor 1 comfort before Investor 1 invested in the Fund.

75. Defendants Used the False PowerPoint, One Pager, and Performance Audit Report to Solicit Investors.

**IV.      Defendants Tried to Evade Detection of Their Fraudulent Conduct.**

76. In or around June 2022, Akshay Kamboj instructed Katz to abandon efforts to solicit an investment from a prospective investor ("Investor 2") after representatives of Investor 2 asked for the Audit Firm Partner to participate in a due diligence call with an attorney.

77. Investor 2 chose not to invest in the Fund.

78. Later, in or around March 2023, as part of its due diligence, another prospective investor ("Investor 3"), emailed the Audit Firm Partner both at the Fake Email Address associated with Defendants and at Audit Firm Partner's actual email account, which was publicly listed on the Audit Firm website.

79. A reply message to Investor 3 sent from the Fake Email Address associated with Defendants removed the Audit Firm Partner's actual email address, falsely explaining to Investor 3 that the "other" address was "monitored by our internal/domestic compliance team for general accounting and tax operations within Australia."

80. Akshay Kamboj separately forwarded Investor 3's email to the real Audit Firm Partner, writing:

> Hi [Audit Firm Partner], This is the below email that I have received on my work accounts and saw you are also cc'd in the same email chain. Kindly do not reply back to this email or open it as this is a malware domain, I happen to have replied back to such an email a few days ago and realized all of my work data and banking information was stolen. I also tried to call you and warn you but no reply. (Got your phone number from Zoominfo.)
>
> I hope you do not fall for this as well. Please call me or text me if you need more info on this.

81. Akshay Kamboj did not include Katz or Investor 3 on his email to the real Audit Firm Partner.

82. In response to a request from Investor 3 to meet the Audit Firm Partner, Akshay Kamboj asked Investor 3 to "please confirm your availability and contact number," but Investor 3 insisted on doing a "Teams or Zoom."

83. A videoconference using Teams or Zoom would have enabled Investor 3 to see that the purported Audit Firm Partner did not match his photograph on the Audit Firm's website, thereby revealing Defendants' fraudulent conduct.

84. Although Katz had circulated an invite for a videoconference with Investor 3, Defendants cancelled the meeting.

85. Investor 3 chose not to invest in the Fund.

## V.  Collapse of the Fund

86. After commencing trading in September 2022, the Fund's returns never matched the fictitious historical track record of the Fund strategy provided to prospective investors in the One Pager and the PowerPoint.

87. In or around late 2023, Defendants executed a series of trades that caused the Fund to suffer significant trading losses.

88. Those losses caused a roughly 40% decline in the Fund's value over a four-month period.

89. As a result of the Fund's poor performance, the Fund experienced significant redemption requests from investors.

90. In or around December 2023, the Investment Firm informed investors that the Fund would be liquidating, and that the Investment Firm would cease taking any further management fees.

91. In or around early 2024, following revelations of potential fraudulent conduct relating to the Fund and before the planned liquidation took place, the Fund's prime broker froze access to its brokerage account.

92. At the time, the Fund had approximately $7.9 million in assets and $12 million in unredeemed investor capital contributions, meaning that investors had lost approximately $4.1 million.

93. Pursuant to the Fund's limited partnership agreement, the Fund paid a total of $80,308.01 in performance fees to the General Partner from inception through the end of 2023.

94. The Fund also paid management fees to the Investment Firm totaling $381,269.95 from inception through the end of 2023.

95. Akshay Kamboj's share of the management and performance fees totaled approximately $115,394.48 on account of his 25% share of the General Partner and the Investment Firm.

96. Dev Kamboj's share of the management and performance fees also totaled approximately $115,394.48 on account of his 25% share of the General Partner and the Investment Firm.

97. The Investment Firm and the General Partner transferred Akshay Kamboj's and Dev Kamboj's respective shares of the management and performance fees to a Kamboj family fund, which Akshay Kamboj controlled and of which he was the sole shareholder.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Against Both Defendants)**

98. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

99. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

100. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against Both Defendants)

101. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 97.

102. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

103. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
September 27, 2024

*/s/  Antonia M. Apps*
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Adam Grace
Travis Hill
Nicholas Flath
Rhonda L. Jung
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9135 (Hill)
HillTr@sec.gov